**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 8 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

KENNETH HOGAN,

     Petitioner - Appellant,

v.

GARY E. GIBSON; THE ATTORNEY
GENERAL OF THE STATE OF
OKLAHOMA,

     Respondents - Appellees.

No. 98-6299

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-97-134-R)**

---

Patrick J. Ehlers, Jr. (Janet Chesley and Vicki Ruth Adams Werneke with him on
the briefs), Assistant Federal Public Defender, Oklahoma City, Oklahoma, for
Petitioner - Appellant.

Jennifer B. Miller, Assistant Attorney General (W.A. Drew Edmonson, Attorney
General of Oklahoma with her on the brief), Oklahoma City, Oklahoma, for
Respondent - Appellee.

---

Before **SEYMOUR**, **BRISCOE** and **LUCERO**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

Kenneth Hogan appeals the denial of his petition for a writ of habeas corpus, alleging seven grounds for relief arising out of his first-degree murder conviction and death sentence in the District Court of Oklahoma County, affirmed by the Oklahoma Court of Criminal Appeals. The United States District Court for the Western District of Oklahoma granted a certificate of appealability, pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b)(1). Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, we reverse and remand to the district court with instructions to grant the writ on the ground that Hogan was denied his constitutional rights under Beck v. Alabama, 447 U.S. 625 (1980), when the trial court refused to instruct the jury on the lesser included offense of first-degree manslaughter.

**I**

On January 28, 1988, Kenneth Hogan stabbed and cut Lisa Stanley more than twenty times in the throat, head, neck, chest, and back. Approximately three of these stab wounds would have been independently fatal without immediate medical attention. George Stanley, the victim's husband, found her dead body that evening in the couple's apartment and called the police. At the crime scene, investigators found evidence of a struggle but no sign of forced entry and discovered a large butcher knife and red stains that appeared to be blood in the bathroom sink. Hogan confessed to the crime six days later.

Hogan and the victim had been friends for several years. Although the exact nature of their relationship was disputed at trial, Becky Glenn, Stanley's close friend and next-door neighbor, testified that Hogan and the victim were close friends who saw each other regularly outside of her husband's presence and without his knowledge during the months leading up to the murder. Hogan's wife testified that Stanley frequently called Hogan during that same time period. Although Hogan told a police officer during his interrogation that he had thought about having sex with Stanley, there is no evidence on the record that the two were ever intimate.

George Stanley testified at trial that approximately six days before the murder, Hogan visited the Stanleys at their apartment, during which time he boasted of taking a martial arts class in which he was learning how to use a knife to cause fatal injury and displayed a knife he had brought with him. George Stanley testified that after the visit, Lisa stated that Hogan was making her nervous.

On the morning of the murder, George and Lisa Stanley smoked marijuana together between approximately 11:00 and 11:45 A.M., before George left for work. In Hogan's February 3, 1988, confession to the police, a tape recording of which was played to the jurors, he related the following:

After lying to his wife about going to work, Hogan visited the Stanley home on the early afternoon of January 28, at Stanley's request, to assist her with a book report she was writing. He and the victim smoked marijuana together.[1] Stanley requested that Hogan steal a stereo for her, but he declined because of burglary charges pending against him. Soon thereafter, the two began to argue. Stanley threw a coat rack down in anger and refused to let Hogan leave the house. Hogan placed his hand over her mouth to quiet her, and she threatened to scream and bang on the apartment walls to alert the neighbors and to tell the police that he had attempted to rape her. Stanley then ran into a bathroom and locked the door. Hogan tried to reason with her, then kicked open the bathroom door and threatened to tell her husband "about the stuff that she's been doing, that he don't know that she is doing . . . or done." (IV O.R. at 947 (Tr. of Feb. 3, 1988, Hogan Interview at 3 (at trial, Def.'s Ex. 3, distributed to jury)) ("Hogan Interview").) Stanley ran towards the front door, but Hogan kicked the door shut and threatened to tell both her husband and her mother about an abortion that she had shortly before her marriage from a sexual encounter with a former boyfriend. Hogan said Stanley then "got a wild look in her eye" and ran to the kitchen. (Hogan

---

[1] Hogan alleges that the marijuana he and Stanley smoked had been dipped in PCP, but a test conducted by the medical examiner's office of Stanley's body revealed no evidence of PCP in her bloodstream. The record contains no evidence to support Hogan's allegation.

- 4 -

Interview at 3.) She returned with a knife and "pushed" the knife at him. As Hogan attempted to grab the knife from her hand, Stanley pulled the knife back and "swung" at Hogan again, cutting him. (Id. at 3.) Hogan seized the knife, and Stanley ran towards the kitchen, where Hogan assumed she was going to get another knife. Hogan claimed he was afraid that Stanley would falsely accuse him of rape to explain his injuries. Hogan chased Stanley and stabbed her repeatedly, ultimately killing her.

Reviewing blood evidence from the crime scene, a police expert concluded that Stanley remained in an upright position during a portion of the stabbing, and that the stabbing began in the kitchen, with the final stabs coming in the living room area. Expert testimony stated that it was not possible to determine whether blood on a fragment of the knife came from only one person. In his confession, Hogan stated that he killed her "[w]ith the knife she cut me with and it wasn't . . . it was like I wasn't even there . . . just somebody else . . . it wasn't even me . . . It was stabbing her and I couldn't stop him." (Id. at 4 (ellipses in original).)

Before fleeing the scene, Hogan threw the room's contents into disarray, hoping to make it appear as though there had been a fight between Stanley and an unknown intruder. He cleaned the wounds Stanley had inflicted on his hand and the butcher knife, left the apartment, and drove to a hospital emergency room for treatment. Hospital staff who admitted him that afternoon testified that he gave

conflicting stories about how he was wounded and that he did not appear to be suffering from either an emotional disturbance or from the influence of drugs. Hogan's hand wounds had bled profusely and ultimately required treatment by a surgeon. An examining physician testified that Hogan's wounds were not inconsistent with his grabbing the knife and having it pulled away.

Hogan later asked his wife to lie to the police about his whereabouts on January 28 and the source of his injuries, but she instead informed investigators that he was not home on the day of the murder, that she did not know where he had been that day, and that he had asked her to tell the police that he had been home all day. Bloodstains were found on Hogan's clothes. On February 3, 1988, the police interviewed Hogan, and during the taped interrogation he ultimately confessed in detail to the killing.

Hogan was convicted and sentenced to death, based on the jury's finding of the "especially heinous, atrocious, or cruel" aggravating circumstance. A divided Oklahoma Court of Criminal Appeals affirmed. See Hogan v. State, 877 P.2d 1157, 1164 (Okla. Crim. App. 1994) ("Hogan I"), reh'g denied, 877 P.2d at 1167, cert. denied, 513 U.S. 1174 (1995). The conviction and sentence were affirmed again on post-conviction review. See Hogan v. State, No. PC-95-1337, at 9 (Okla. Crim. App. Dec. 19, 1996) ("Hogan II"). After exhausting all available remedies for post-conviction relief in Oklahoma, Hogan filed a timely petition for

habeas corpus in federal district court in June 1997, raising thirteen claims concerning his trial and sentencing hearing, and alleging ineffective assistance of trial and appellate counsel. The district court denied Hogan's petition, but granted him a certificate of appealability as to all issues. See Hogan v. Ward, No. CIV-97-134-R (W.D. Okla. April 24, 1998) ("Hogan III").

## II

Because Hogan filed his habeas petition on June 30, 1997, more than a year after the April 24, 1996, effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the provisions of AEDPA dictate our standard of review for Hogan's petition. See Rogers v. Gibson, 173 F.3d 1278, 1282 n.1 (10th Cir. 1999). We may not grant Hogan's petition for a writ of habeas corpus

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>     (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>     (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[2]

---

[2] Numerous circuits have attempted to elaborate on the meaning of 28 U.S.C. § 2254(d), as amended by AEDPA. See generally Matteo v. Superintendent, 171 F.3d 877, 885-91 (3d Cir.), cert. denied, 120 S. Ct. 73 (1999) (summarizing approaches of other circuits and presenting a distinct interpretation). The United States Supreme Court has granted certiorari in a case presenting for review the Fourth Circuit's interpretation of the standards. See Williams v. Taylor, 163 F.3d 860, 865-66 (4th Cir. 1998), cert.

(continued...)

## III

We confront Hogan's argument that the trial court's failure to instruct the jury on first-degree manslaughter and second-degree murder denied him his constitutional due process rights as defined by Beck v. Alabama, 447 U.S. 625 (1980), and its progeny. At trial, Hogan's counsel had requested only a first-degree manslaughter instruction. Hogan's claim that the trial court committed reversible error in not giving a second-degree murder instruction was raised for the first time on post-conviction review before the Oklahoma Court of Criminal Appeals, which found the claim to be waived. See Hogan II, No. PC-95-1337, at 2 n.5.[3] We therefore begin by considering Hogan's preserved Beck claim challenging the trial court's failure to provide the jury with a first-degree manslaughter instruction. The Oklahoma Court of Criminal Appeals discussed the claim in response to Hogan's petition for rehearing of his direct appeal. See Hogan I, 877 P.2d at 1167-68.

_____

[2](...continued)
granted, 119 S. Ct. 1355 (Apr. 5, 1999) (No. 98-8384). For purposes of this case, however, we need not establish a precise interpretation for this Circuit in the interim because, as discussed at Part III.C, the Oklahoma Court of Criminal Appeals did not adjudicate Hogan's Beck claim on the merits.

[3] "[A] state prisoner seeking federal habeas relief may not prevail on a Beck claim as to a lesser included instruction that he or she failed to request at trial." Hooks v. Ward, 184 F.3d 1206, 1234 (10th Cir. 1999). Because we reverse the district court with orders to grant the writ of habeas corpus to order a new trial, we do not address, because they may not recur, Hogan's claims of constitutionally ineffective assistance of counsel arising from counsel's failure to request a second-degree murder instruction.

## A

Beck held that "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. at 627 (quotation omitted). The Court explained its rationale as follows: "[W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." Id. at 637. In other words, the purpose of the rule "is to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." Spaziano v. Florida, 468 U.S. 447, 455 (1984) (citing Beck, 447 U.S. at 638-43). More recently, the Court has held there is no constitutional violation under Beck either when a court instructs the jury on one lesser included offense supported by the evidence even if others might be warranted, see Schad v. Arizona, 501 U.S. 624, 647-48 (1991), or when a jury is given no option other than a capital offense at the guilt phase of a trial where the state law under which the defendant was

convicted has no lesser included offense, see Hopkins v. Reeves, 118 S. Ct. 1895, 1900-03 (1998).

Unlike Hopkins, 118 S. Ct. at 1900, where Nebraska courts had consistently held "that second-degree murder and manslaughter are not lesser included offenses of felony murder," id. (citations omitted), Oklahoma courts have treated first-degree "heat of passion" manslaughter as a lesser included offense of first-degree murder. See, e.g., Boyd v. Ward, 179 F.3d 904, 917 (10th Cir. 1999) (stating that under Oklahoma law "first degree manslaughter . . . is a lesser included offense of first degree murder") (citing Lewis v. State, 970 P.2d 1158, 1165-66 (Okla. Crim. App. 1999)); Shrum v. State, No. F-98-497, 1999 WL 974019, at *3 (Okla. Crim. App. Oct. 27, 1999); Turrentine v. State, 965 P.2d 955, 969 (Okla. Crim. App. 1998); Le v. State, 947 P.2d 535, 546 (Okla. Crim. App. 1997), cert. denied, 118 S. Ct. 2329 (1998); see also Hooks v. Ward, 184 F.3d at 1235-37 (analyzing Oklahoma courts' refusal to give first-degree manslaughter instruction under Beck); Jackson v. State, 964 P.2d 875, 899 (Okla. Crim. App. 1998) (Lumpkin, J., concurring) (stating that "First Degree Manslaughter, heat of passion, could be a lesser included offense of malice murder, based on an analysis of the elements of each offense . . . . [T]he concept

of heat of passion is fairly embraced and included within the element of pre-meditation"). [4]

Respondent-appellee argues as a preliminary matter that <u>Beck</u> is inapplicable to Oklahoma.  Unlike the procedure under review in <u>Beck</u>, in which the jury was forced to choose between death and acquittal, Oklahoma's capital trial procedure "allows a jury to know, during voir dire, that there are three sentencing options for first degree murder:  life, life without parole, and death; therefore, the guilt determination is not dependent on the jury's feeling on whether the defendant deserves death."  <u>Willingham v. State</u>, 947 P.2d 1074, 1082 (Okla. Crim. App. 1997), <u>cert. denied</u>, 118 S. Ct. 2329 (1998), <u>overruled on other grounds by</u> <u>Shrum</u>, 1999 WL 974019, at *3 & n.8.  After consideration of this distinction and careful review of <u>Beck</u> and its progeny, however, we determined conclusively that "a defendant in a capital case [is entitled] to a lesser included instruction when the evidence warrants it, notwithstanding the fact that the jury may retain discretion to issue a penalty less than death," and we held that the rule

---

[4] Oklahoma at one time employed, although inconsistently, the statutory elements test for determining whether an offense is a lesser included offense of a particular crime, comparing the statutory elements of the lesser offense to those of the greater to determine whether all of them are contained therein. See <u>Shrum</u>, 1999 WL 974019, at *3 & n.8 (overruling <u>Willingham v. State</u>, 947 P.2d 1074, 1080 (Okla. Crim. App. 1997) and holding, prospectively, that Oklahoma adopts the "elements approach" for determining whether a lesser included offense instruction is warranted); <u>see generally</u> <u>Hopkins</u>, 118 S. Ct. at 1901 n.6 (discussing statutory elements and "cognate evidence" approaches to determining whether one offense is a lesser included offense of another).

in Beck indeed applies to Oklahoma. Hooks, 184 F.3d at 1227. We therefore

consider the merits of Hogan's Beck claim.

**B**

In its denial of rehearing on the direct appeal, the Oklahoma Court of

Criminal Appeals briefly discussed the claim that Hogan was constitutionally

entitled to a first-degree manslaughter instruction. See Hogan I, 877 P.2d at

1167. The court noted that the jury "was given a lesser included instruction as it

related to self-defense and this clearly would be a 'third option' for the jury. . . .

[T]he case before us [is unlike Beck because] the jury was instructed and given a

lesser included offense option." Id.

The Oklahoma court assumed that a self-defense instruction constitutes a

lesser included offense instruction and thus a "third option" in addition to capital

murder and acquittal. This assumption is contrary to the meaning of Beck and its

progeny. Self-defense is not a lesser included offense of a murder charge; rather,

if a defendant proves a defense of "perfect" self-defense to a murder charge, "his

homicide is justified, and he is guilty of no crime—not murder, not manslaughter,

but no crime." 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal

Law § 7.11(a), at 271 (1986). Under Oklahoma law, homicide committed in self-

defense "[w]hen resisting any attempt to murder [the defendant], or to commit any

felony upon him" or in the defendant's "lawful defense . . . when there is a

- 12 -

reasonable ground to apprehend design to commit a felony, or do some great personal injury, and imminent danger of such design being accomplished," is deemed justifiable homicide. Okla. Stat. tit. 21, § 733; see also Camron v. State, 829 P.2d 47, 56 (Okla. Crim. App. 1992) ("Our statutes recognize . . . the defense of justifiable homicide [which] is available to any person when the homicide is committed under one of the . . . fact situations set forth in [Okla. Stat. tit. 21,] § 733."); cf. Schad, 501 U.S. at 647 (holding that the failure to give lesser included offense instruction does not render a capital verdict unreliable if the jury has been instructed on another lesser offense because the jury is not forced into an all-or-nothing choice). Justifiable homicide is equivalent to acquittal and therefore does not obviate the dilemma underlying the concerns of Beck. See Beck, 447 U.S. 642-43.

Similarly, the state appellate court's original conclusion on direct appeal that a manslaughter instruction was not necessary because there was "sufficient evidence" to support a finding of premeditation in the trial record is squarely contrary to the holding of Beck. Hogan I, 877 P.2d at 1160. Beck, 447 U.S. at 627, requires a court to consider whether there is sufficient evidence to warrant instructing the jury on a lesser included offense, not whether there is sufficient evidence to warrant conviction on the greater offense. A Beck claim is not the functional equivalent of a challenge to the sufficiency of the evidence for

conviction; rather, <u>Beck</u> focuses on the constitutionality of the procedures employed in the conviction of a defendant in a capital trial and is specifically concerned with the enhanced risk of an unwarranted capital conviction where the defendant's life is at stake and a reasonable jury could have convicted on a lesser included offense.  <u>See</u> <u>id.</u> at 637.  Given these concerns, the sufficiency of the evidence of the greater offense is distinct from the <u>Beck</u> inquiry into whether the evidence might allow a jury to acquit a defendant of the greater of the offenses and convict him or her of the lesser.[5]

## C

Neither the Oklahoma Court of Criminal Appeals' inquiry as to whether instructing the jury on self-defense when a lesser included offense is available and supported by the evidence, nor its finding that there was sufficient evidence to convict appellant of the greater offense, satisfies the constitutional requirements of <u>Beck</u> and its progeny.  Supreme Court precedent requires that the jury in a capital case be provided, in appropriate circumstances, with more than a

---

[5] Moreover, even under our rule of deference to state court interpretations of state law, <u>see</u> <u>Boyd</u>, 179 F.3d at 917, we must note that the conclusion of the Court of Criminal Appeals is "clearly inaccurate" under established state law, which dictates that evidence of intent does not render improper instruction on manslaughter.  <u>Le</u>, 947 P.2d at 546 ("The State suggests that the [first-degree manslaughter] instruction is improper wherever there is evidence of intent.  This is clearly inaccurate; under that theory a heat-of-passion instruction would never be appropriate where there was evidence of malice murder.").

- 14 -

choice between first-degree murder and acquittal. See, e.g., Spaziano, 468 U.S. at 456 ("We reaffirm our commitment to the demands of reliability in decisions involving death and to the defendant's right to the benefit of a lesser included offense instruction that may reduce the risk of unwarranted capital convictions."). The Oklahoma Court of Criminal Appeals' rejection of Hogan's Beck claim on grounds either that Hogan's self-defense instruction constituted a lesser included instruction, or that the evidence was sufficient to support conviction on the greater charge, is in gross deviation from, and disregard for, the Court's rule in Beck.

Under Beck, a petitioner is required to establish not only the denial of a lesser included offense instruction, but also that he presented sufficient evidence to warrant such an instruction. See Beck, 447 U.S. at 637. Thus, while the Oklahoma Court of Criminal Appeals cited a standard consistent with Beck, see Hogan I, 877 P.2d at 1160 (stating that "[t]he trial court only has the duty to instruct on lesser degrees when required by the evidence") (citing Dunford v. State, 702 P.2d 1051 (Okla. Crim. App. 1985); Jones v. State, 650 P.2d 892 (Okla. Crim. App. 1982)), we do not find the expected analysis under that standard in the discussion that follows. Instead, the Oklahoma Court of Criminal Appeals engaged in the wrong inquiry—asking on rehearing whether Hogan's self-defense instruction constituted a lesser included instruction, or initially

- 15 -

whether the evidence was sufficient to support conviction on the greater charge, but <u>never</u> engaging in the correct inquiry as to whether Hogan presented sufficient evidence to warrant a first-degree manslaughter instruction.

Pursuant to AEDPA, the applicable standard of review depends on whether we characterize an examination of the sufficiency of the evidence for a lesser included offense instruction as a "determination of a factual issue," 28 U.S.C. § 2254(e)(1), or a legal conclusion. If the determination of insufficient evidence is a legal conclusion, we are to ask whether it was contrary to or an unreasonable application of clearly established Supreme Court precedent. <u>See</u> 28 U.S.C. § 2254(d)(1). If, on the other hand, it is a factual determination, we ask whether it represented "an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d)(2), and give the state court's determination a presumption of correctness that can be rebutted only by clear and convincing evidence. <u>See</u> 28 U.S.C. § 2254(e)(1). As we recently noted in <u>Moore v. Gibson</u>, Nos. 98-6004, -6010, 1999 WL 765893, at *22-23 (10th Cir. Sept. 28, 1999) (citing cases), our precedents have not been consistent in their treatment of whether a question of sufficiency of the evidence represents a legal conclusion or a factual determination. <u>But cf.</u> <u>Bryson v. Ward</u>, 187 F.3d 1193, 1207 (10th Cir. 1999) (treating determination that evidence did not support lesser included offense instructions as factual determination subject to presumption of correctness

- 16 -

under 28 U.S.C. § 2254(e)(1)).  We need not determine definitively which is the more appropriate analysis, however, because there is no finding discernible to us that is entitled to any kind of deference under the standards of review provided for by 28 U.S.C. § 2254(d)(2) & (e)(1).[6]  Deference to the state court under AEDPA is only required for "any claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); see, e.g., Moore, 1999 WL 765893, at *7; Wallace v. Ward, No. 98-7116, 1999 WL 705152, at *3 (10th Cir. Sept. 10, 1999); Hooks, 184 F.3d at 1223.  Here, because the Oklahoma Court of Criminal Appeals made no findings as to whether Hogan had presented sufficient evidence to warrant a first-degree manslaughter instruction, it is axiomatic that there are no findings to which we can give deference.  As such, we will consider Hogan's Beck claim on the merits.  Hooks, 184 F.3d at 1223.  Since the state court did not decide the claim on its merits, and instead the federal district court decided the claim in the first instance, we review the district court's conclusions of law de novo and factual findings, if any, for clear error.  See, e.g., Moore, 1999 WL 765893, at *7; LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999).

---

[6] We note that although we cannot resolve this inconsistency, this panel unanimously agrees that the correct approach is to treat a determination of the sufficiency of the evidence for a lesser included offense instruction as a conclusion of law.  See Bryson, 187 F.3d at 1210-13 (Briscoe, J., concurring).

Although Beck did not establish a clear rule as to the precise quantum of evidence that would warrant an instruction on a lesser included offense, the Beck Court noted that "[i]n the federal courts, it has long been 'beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.'" Beck, 447 U.S. at 635 (quoting Keeble v. United States, 412 U.S. 205, 208 (1973)).[7]  This Circuit has since adopted and applied that standard in considering the sufficiency of the evidence of a lesser included offense for Beck purposes on habeas review.  See, e.g., Hatch v. Oklahoma, 58 F.3d 1447, 1454 (10th Cir. 1995) (denying Beck claim because "there is not 'evidence, which, if believed, could reasonably have led to a verdict of guilt of a lesser offense'") (quoting Hopper v. Evans, 456 U.S. 605, 610 (1982)); Parks v. Brown, 840 F.2d 1496, 1499-1502 (10th Cir. 1987), rev'd on other grounds, 860 F.2d 1545 (10th Cir. 1988) (en banc), rev'd on other grounds sub nom. Saffle v. Parks, 494 U.S. 484 (1990); see also Cordova v. Lynaugh, 838 F.2d 764, 767 (5th Cir. 1988), overrulling on other grounds recognized by Vanderbilt v. Collins, 994 F.2d 189, 195 (5th Cir. 1993) (holding that "the federal standard—a lesser included offense must be given when a jury could rationally convict of the lesser offense

_____

[7] The Court in Beck, 447 U.S. at 636 n.12, surveyed the practice of the states and found it consistent with this standard.

- 18 -

and acquit on the greater offense—is equivalent to the <u>Beck</u> standard").[8]  To

succeed in his claim that the trial court's failure to instruct the jury on first-

degree manslaughter violated <u>Beck</u>, Hogan must demonstrate that the evidence

presented at trial would permit a rational jury to find him guilty of first-degree

manslaughter and acquit him of first-degree murder.  See <u>Hopper</u>, 456 U.S. at

610.

The relevant portion of Oklahoma's first-degree manslaughter statute

defines the crime as homicide "perpetrated without a design to effect death, and

in a heat of passion, but in a cruel and unusual manner, or by means of a

dangerous weapon."  Okla. Stat. tit. 21, § 711(2).[9]  Heat of passion and the lack

---

[8]  We note that the sufficiency standard for lesser included instructions in Oklahoma, <u>see</u> Okla. Stat. tit. 22, § 916, is consistent with the standard cited in <u>Beck</u> and adopted by this Circuit.  See <u>Beck</u>, 447 U.S. at 636 & n.12 (discussing various state descriptions of quantum of proof required for a lesser included offense instruction and characterizing all as consistent with the standard "where the evidence warrants it"); <u>Boyd v. State</u>, 839 P.2d 1363, 1367 (Okla. Crim. App. 1992) (holding that trial courts are required to instruct the jury "on every degree of homicide which the evidence in any reasonable view suggests"); <u>Shrum</u>, 1999 WL 974019, at *1 (holding that trial court "must include all lesser included offenses supported by the evidence"); <u>see also</u> <u>Le</u>, 947 P.2d at 546 (holding that where there is evidence of intent and a first-degree murder instruction is given, a heat-of-passion manslaughter instruction is also required if evidence exists to support a conviction under Oklahoma's manslaughter statute).

[9]  By contrast, under Oklahoma law, "[a] person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being.  Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof."  Okla. Stat. tit. 21, § 701.7(A).  The design to effect death "is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed."  Okla. Stat. tit. 21, §

(continued...)

- 19 -

of design to effect death are related requirements: "[T]he 'heat of passion must render the mind incapable of forming a design to effect death before the defense of manslaughter is established.'" Allen v. State, 821 P.2d 371, 374 (Okla. Crim. App. 1991) (quoting Walker v. State, 723 P.2d 273, 284 (Okla. Crim. App. 1986)); see generally Brown v. State, 777 P.2d 1355, 1358 (Okla. Crim. App. 1989) (explaining that Oklahoma subscribes to the "minority view" of first-degree manslaughter that requires both heat of passion and no design to effect death). "The elements of heat of passion are 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) [the] homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection between the provocation, passion and homicide." Charm v. State, 924 P.2d 754, 760 (Okla. Crim. App. 1996) (citing Allen, 821 P.2d at 374).

The phrase "a design to effect death" is treated as synonymous with "an intent to kill." See, e.g., Smith v. State, 932 P.2d 521, 532-33 (Okla. Crim. App. 1996). Thus, under Oklahoma law, even if a person kills in the heat of passion, the killing may not be classified as first-degree manslaughter if the person intended death to result from the act. A defendant is thus entitled to a

---

[9](...continued)
702. Moreover, "[a] design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution." Okla. Stat. tit. 21, § 703.

manslaughter instruction only if the evidence at trial would allow a jury to rationally conclude the defendant's rage rendered him or her incapable of forming a design to effect death.  See Allen, 821 P.2d at 374.

We agree with the district court that the Oklahoma Court of Criminal Appeals, on direct appeal, failed "to consider what, if any, evidence supported Hogan's theory of manslaughter." Hogan III, No. CIV-97-134-R, at 14.  The Oklahoma Court of Criminal Appeals stated:

> [H]eat of passion alone does not reduce a homicide to manslaughter without adequate provocation.  We have held the fatal blow or blows must be the unpremeditated result of the passion aroused.  The statement of the defendant plus the facts show that the blows did not come because of any overt acts on the part of the deceased, but came because the defendant believed the reporting of attempted rape, together with his pending burglary charge, would result in his imprisonment.

Hogan I, 877 P.2d at 1160 (internal citation omitted).  Despite having paraphrased the contents of Hogan's confession in its recitation of the facts of the case, see id. at 1159-60, the state appeals court's analysis excerpted above does not confront the merits of Hogan's Beck claim.  The Hogan I majority fails completely to discuss Hogan's statements in his confession that the victim initially committed the overt act of coming at him with a knife and that the murder weapon was the knife with which she originally attacked him.  Nor does the court acknowledge, in determining that the evidence was insufficient to warrant a manslaughter

- 21 -

instruction, that Hogan's knife injuries were corroborated by medical personnel at the hospital where Hogan sought treatment after the murder.

Absent, too, is any mention of Hogan's statement that he thought Stanley was running to the kitchen to retrieve another knife when he began to stab her. Specifically, Hogan told the police the following:

> I was putting my coat on . . . and she just pushed [the knife] right at me . . . I didn't know what to say, do, or think, I just grabbed the knife . . . and it hurt, it hurt, cause when I grabbed it, she pulled it back and she swung at me again and got there, that's when I just sw [sic]. . . just bent it down and it just come right out of her hand and she just ran back toward the kitchen like she was gonna get another one and I, and I just knew that she was gonna tell the Police that I'd tried to rape her, that's why she cut me and I knew they'd believe her over me cause I, cause I have burglary charges against me . . . .

(Hogan Interview at 3-4 (ellipses in original).) Under Oklahoma law, homicide in response to a victim's unprovoked attack with a dangerous weapon may constitute first-degree manslaughter. See Le, 947 P.2d at 546 & n.21 (citing Hayes v. State, 633 P.2d 751, 752 (Okla. Crim. App. 1981); Farmer v. State, 565 P.2d 1068, 1070 (Okla. Crim App. 1970); Williams v. State, 513 P.2d 335, 336-38 (Okla. Crim. App. 1973)).

Furthermore, the confession, along with other testimony introduced at trial, demonstrates that the victim and defendant had a longstanding, close relationship prior to the homicide, and that the defendant was visiting the victim at her request in order to assist her in writing a book report for a class she was taking. There

was no evidence introduced at trial that the defendant and victim had ever assaulted each other, or even argued prior to the homicide. Finally, Hogan's confession alleged Stanley "got a wild look in her eye" immediately prior to attacking him with a knife, and that he and the victim were both consumed by the passion of their argument.

Although Hogan's confession, along with other evidence in the record, can be read to support a conclusion that Hogan killed Stanley out of his fear of incarceration, it also may be used by a jury to rationally find that Hogan had established adequate provocation and a causal connection between Stanley's initial attack and the homicide. The confession also may evidence Hogan's fear that the victim was attempting to get another knife, that his anger and rage arose from the argument that consumed the two close friends, and that he acted before there was any reasonable opportunity for his passion to cool. In conclusion, these elements of Hogan's confession could lead a reasonable jury to find adequate provocation, heat of passion resulting from fear and terror, causation, and immediacy, so as to warrant a first-degree manslaughter instruction. See Le, 947 P.2d at 546-47; Charm, 924 P.2d at 760; see also Wood v. State, 486 P.2d 750, 752 (Okla. Crim. App. 1971) ("It is the general rule that passion resulting from fright or terror may be sufficient to reduce a homicide from murder to

manslaughter and such a killing may be closely akin to a killing in self-defense.")
(citation omitted).

Hogan's confession, the central facet of the case against him, also could have led a reasonable jury to conclude that his heat of passion rendered him incapable of forming a design to effect death. Hogan described the killing as follows: "[I]t was like I wasn't even there . . . just somebody else . . . it wasn't even me. . . . It was stabbing her and I couldn't stop him." (Hogan Interview at 4.) In his confession, Hogan also specifically denied intending to kill Stanley: "I didn't even realize that I'd killed her until the next day, all I knew was my hand hurt and she was dead," (id.); "I mean I didn't do it on purpose, I can't even sleep at night without waking up," (id.); "I didn't mean to hurt her," (id. at 3). While a jury might have disbelieved these statements as self-serving, had it believed them, it could have concluded Hogan's fear and anger rendered him incapable of forming the requisite intent.

The facts of this case strikingly resemble those of Williams, 513 P.2d at 335, in which the Oklahoma Court of Criminal Appeals found that a first-degree manslaughter instruction was warranted. The defendant in Williams, who was the only witness to his murder of his wife, testified in his own defense and provided a description of the crime remarkably similar to that which the jury in Hogan's trial heard in Hogan's confession to the police. Following an argument in which his

- 24 -

wife warned him that "I think I'll just cut your black heart out," Williams

testified:

> [S]he went through that room that went into her bedroom, which was the short way to the kitchen and I had this pistol right there beside my bed in the bottom drawer and I picked it up thinking that she would probably come back. . . . [A]nd then I discovered she was using the telephone and I walked over there and I said "Honey don't call, don't call. I'll leave." And the next thing I saw was something up here which I thought was a butcher knife and I had the pistol in my left hand. I didn't have no idea of using it. I was going to try to protect myself to get out of the house and I wanted to stop her from making the telephone call. So she drew back and swung at me and I threw my right arm to try to ward off the blow and she missed me. I don't know if she even touched me or not. I just don't know and I just had the gun down there and I just pulled the trigger and when it went off . . . I've shot a .45 pistol a lot in training bird dogs to keep them from going gun-shy as a puppy, but in an inclosure I had never heard one and I'll tell you honestly it's a terribly loud noise and I just went blank and just stood there just pumping that gun.

Id. at 336 (ellipsis in original). As in Hogan's confession, the assailant attempted

to leave the scene prior to the homicide but claimed he was barred from doing so

by the victim; as in Hogan's confession, the victim attacked first with a knife; and

as in Hogan's confession, the assailant described the killing itself in distanced,

passive terms—"I just went blank and just stood there just pumping that gun," id.,

in Williams's case, and "[I]t was like I wasn't even there . . . just somebody else .

. . it wasn't even me. . . . It was stabbing her and I couldn't stop him," in

Hogan's. (Hogan Interview at 4.) Just as Hogan stabbed his victim multiple

times, creating three wounds that would have been independently fatal, the

- 25 -

defendant in <u>Williams</u> shot his wife eight times at close range, and expert testimony at trial stated that any one of five wounds could have independently been fatal. <u>See</u> <u>Williams</u>, 513 P.2d at 336. In short, the circumstances surrounding Hogan's attack and the attack itself bear a striking resemblance to those before the court in <u>Williams</u>.

After reviewing the defendant's testimony in <u>Williams</u>, the Oklahoma Court of Criminal Appeals concluded that "[t]he jury might reasonably interpret the evidence to show that the initial firing of the gun was caused by a sudden and unexpected attempt to attack defendant with a pair of scissors and fired by the defendant while in a heat of passion," and that a jury could have interpreted the defendant's testimony as proof of a "lack of a premeditated design to effect death." <u>Id.</u> at 338. Therefore, the <u>Williams</u> Court held that the trial court committed reversible error in failing to give the jury a first-degree manslaughter instruction. <u>Id.</u> at 338-39. In the case before us, a jury could reasonably interpret Hogan's description of his initial stabbing of Stanley as a response, made in the heat of passion, to her knife attack, based on his belief that, having been disarmed, Stanley was running to the kitchen to obtain another weapon. Under Oklahoma's own law in <u>Williams</u>, Hogan's confession constitutes sufficient trial evidence of heat of passion and lack of intent to kill presented at trial to warrant a first-degree manslaughter instruction, and that a reasonable juror

could have convicted Hogan of manslaughter and acquitted him of first-degree murder.

The district court, after concluding the state appellate court conducted an incorrect legal analysis of Hogan's <u>Beck</u> claim, nevertheless found the evidence at trial insufficient to support an instruction on a lesser included offense. <u>See</u> <u>Hogan III</u>, No. CIV-97-134-R, at 14-15. We disagree. Most significantly, the district court dismissed the contents of Hogan's confession—including its description of the events leading up to the murder and of the murder itself—as mere "self-serving statements" that "are insufficient to support manslaughter instructions." <u>Id.</u> at 15 (citing <u>Ross v. State</u>, 717 P.2d 117, 121 (Okla. Crim. App. 1986), <u>affirmed</u>, 487 U.S. 81 (1988)). Hogan's confession, however, was the centerpiece of the government's case and is the only account in the record of the murder itself. As discussed above, the ambiguity of the statements therein permit reasonable inferences of both first-degree murder and first-degree manslaughter. It is unreasonable to recognize the confession for only one of these possible inferences: that Hogan, motivated by fear and anger that Stanley might wrongly accuse him of rape, acted with malice and intent to kill. Given the centrality of the confession to the case, it is unreasonable to ignore it to the extent it supports an alternative inference, one that is inculpatory as to first-degree manslaughter

and exculpatory as to first-degree murder: that Hogan, reacting to adequate provocation, acted in a heat of passion and without a design to effect death.[10]

The district court also erroneously concluded that the multiple stab wounds Hogan inflicted upon Stanley, viewed by themselves, "clearly indicate[] Hogan had a 'design to effect death,'" and that Hogan was therefore not entitled to manslaughter instructions. Hogan III, No. CIV-97-134-R, at 16; see Okla. Stat. tit. 21, § 702 (providing the fact of killing permits an inference of design to effect death absent reasonable doubt arising from the circumstances). Under Oklahoma law, depending on the evidence as to the totality of the circumstances surrounding the homicide, a defendant may still be eligible for a first-degree manslaughter instruction even where the defendant is alleged to have caused multiple,

---

[10] The fact that a confession may be to some degree self-serving does not deprive a jury of its prerogative to consider that fact in evaluating the credibility of a claim of provocation and passion. See, e.g., Provo v. State, 549 P.2d 354, 356-57 (Okla. Crim. App. 1976); Williams, 513 P.2d at 338. Ross held that self-serving statements of wishing merely to wound, combined with expressions of regret, were insufficient to warrant a first-degree manslaughter instruction. Ross, 717 P.2d at 121-22 (citing Lumpkin v. State, 683 P.2d 985, 988 (Okla. Crim. App. 1984)). Viewed in light of the consideration of such statements in cases such as Williams, however, it is obvious the insufficiency of evidence for a manslaughter instruction in Ross stemmed not merely from the self-serving character of the statements but also from the absence of any of the other elements of first-degree manslaughter. See Okla. Stat. tit. 21, § 711 (defining elements of manslaughter in the first degree). Such an interpretation of Ross is mandated by its citation to Lumpkin, which nowhere holds that self-serving statements are categorically inadmissible, but rather rejects arguments regarding heat of passion and misdemeanor manslaughter instructions for lack of any evidence regarding heat of passion and an underlying misdemeanor, respectively. See 683 P.2d at 988.

- 28 -

independently-fatal wounds.  See Williams, 513 P.2d at 336-39; cf. Duvall v. State, 825 P.2d 621, 627 (Okla. Crim. App. 1991) (considering "the nature of [numerous stab] wounds and surrounding circumstances," including no evidence of heat of passion, in holding that no instruction on manslaughter was required in a capital murder trial).  Furthermore, we reiterate that under Oklahoma law, evidence of intent does not necessarily prohibit a court's issuing an instruction on manslaughter.  See supra note 5 (quoting Le, 947 P.2d at 546).

Nevertheless, respondent-appellee argues, under Darks v. State, 954 P.2d 152 (Okla. Crim. App. 1998), that premeditation can be inferred directly from the homicide itself, without considering the circumstances thereof.[11]  Cf. Okla. Stat. tit. 21, § 702 ("A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed.").  In Darks, 954 P.2d at 161, the court found that four gunshots made at close range to vital parts of the victim's body led to the conclusion that there was insufficient evidence to warrant a manslaughter instruction.  The key, undisputed circumstances of the homicide in Darks, however, which involved multiple gunshots to the head and back and no mutual combat, are clearly distinguishable

[11] While we are bound to defer to state courts' "subsidiary interpretations of state law," Boyd, 179 F.3d at 917 (citing Davis, 100 F.3d at 771), we note that no Oklahoma state court—certainly not the court reviewing Hogan's claims—has interpreted Darks as urged by the appellee in this case.  We owe no deference to a novel view of state law urged by a party to a case and never enunciated by a state court.

from the facts in the case before us. Darks and his victim had a longstanding animosity over the custody of their child, and the victim had called the police immediately before the murder and claimed that the defendant had run her car off the road and taken the child from her. See id. at 156-57. Accordingly, we cannot conclude that the Court of Criminal Appeals in Darks impliedly overruled its own long-established case law, which holds that the quantity and quality of the wounds cannot be viewed by themselves to be irrefutable evidence of premeditation precluding a first-degree manslaughter instruction.[12]

As discussed above, despite the circumstantial evidence of intent provided by the nature of the killing, there was also direct testimonial evidence by Hogan that he lacked a design to effect death. Beck requires that where the evidence supports such alternative theories, the jury be presented the option to choose between them, and not only to choose between a capital conviction and acquittal.

Based on our review of the record, we conclude that petitioner-appellant's constitutional rights were violated by the trial court's refusal to instruct the jury on first-degree manslaughter, despite evidence sufficient to warrant the instruction; that the Oklahoma Court of Criminal Appeals acted contrary to established Supreme Court precedent in its review of Hogan's Beck claim because

---

[12] Our rejection of appellee's urged interpretation is bolstered by the statutory instruction to consider whether accompanying circumstances permit a "reasonable doubt"as to intent to kill. Okla. Stat. tit. 21, § 702.

of its failure to query whether the evidence was sufficient to warrant a lesser included offense instruction; and that the district court's conclusion that the evidence was insufficient to warrant the instruction was erroneous.

Hogan himself confessed to committing a reprehensible act of violence. By denying the jury the option to convict him on a lesser, non-capital offense supported by the evidence, thus leaving only a choice between conviction of capital murder and acquittal, Oklahoma may have "encourage[d] the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished." Beck, 447 U.S. at 642. Hogan must, therefore, be retried.[13]

Having reached that conclusion, we decline to consider the other trial-related issues Hogan raises in his appeal—including his claim counsel rendered ineffective assistance in failing to seek a second-degree murder instruction—because they may not recur in his retrial. See, e.g., United States v. Torrez-Ortega, 184 F.3d 1128, 1137 n.8 (10th Cir. 1999); United States v. Sullivan, 919 F.2d 1403, 1421 (10th Cir. 1990).

_____

[13] A Beck error can never be harmless. See Hopper, 456 U.S. at 610 ("[T]he jury [in a capital case] must be permitted to consider a verdict of guilt of a noncapital offense 'in every case' in which 'the evidence would have supported such a verdict.'"). As the Fifth Circuit has noted, "[t]he nature of the initial [Beck] inquiry itself is very similar to a harmless error analysis. If the instruction was refused, but the jury could not rationally convict on the lesser offense, then the alleged error would be harmless. In other words, the harm is subsumed in the test itself." Cordova, 838 F.2d at 770 n.8.

**IV**

The judgment of the district court denying the writ is reversed.  We
**REVERSE** and **REMAND** to the district court to grant the writ, conditioned
upon the retrial of Hogan by the State of Oklahoma.