HENRY, Chief Judge,
dissenting in part.
“This was a horrible crime.” Gilson v. State, 8 P.3d 883, 930 (Okla.Crim.App.2000) (Chapel, J., dissenting). It is difficult to imagine a more heart-rending set of facts than those that befell a helpless and innocent Shane Coffman. There is no question that Donald Gilson had a history of abusing at least some of the Coffman children, who lived in fear of him, and I rest assured that he will be punished for that abuse, as he was convicted of two out of five counts of injury to a minor. Further, should the court see fit to adopt the reasoning of this partial dissent, Mr. Gil-son would again face trial for murder or manslaughter with a properly instructed jury.
I am aware that we owe state courts great deference under AEDPA. We may only reverse their determinations in the most limited circumstances. Nevertheless, when a death sentence is imposed we must be certain that it was with the full protections of the Constitution.
It was with this in mind that Congress enacted 28 U.S.C. § 2254, providing habe-as relief in order “to interpose the federal courts between the States and the people, as guardians of the people’s federal rights — to protect the people from unconstitutional action.” Reed v. Ross, 468 U.S. 1, 10, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984) (internal quotation marks omitted). This protection is most crucial when the defendant’s life hangs in the balance. “[D]eath is a different kind of punishment from any other which may be imposed in this country. ... It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.” Gardner v. Florida, 430 U.S. 349, 357-58, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).
The majority opinion is well-written and carefully resolves a number of issues in this prosecution under a relatively new and unique statute. While I agree with much of its resolution of the issues before us, I must part company on one vital issue protected by our legal heritage. In a case with such disturbing facts, filed against a defendant who had at least some history of abuse, the risk of an unwarranted conviction is especially high. “The absence of a lesser included offense instruction increases the risk that the jury will convict ... simply to avoid setting the defendant free.” Spaziano v. Florida, 468 U.S. 447, 455, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). This “risk cannot be tolerated in a case in which the defendant’s life is at stake.” Beck v. Alabama, 447 U.S. 625, 637, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).
Ms. Coffman, whose guilty plea was accepted by the state court, was convicted of first-degree murder and received a sentence of life in prison. The dispositive portion of Mr. Gilson’s appeal is only about what role Mr. Gilson played in Shane’s murder. When determining the narrow question whether Mr. Gilson was entitled *1251 to a jury instruction on second-degree manslaughter, we have only one question before us — what could a reasonable jury have found regarding Mr. Gilson’s culpability in Shane’s death? Evidence was presented at trial that Mr. Gilson played no part in abusing Shane the day he died and that he was asleep on the couch during the abuse that led to Shane’s death. A rational jury could have believed this evidence and found Mr. Gilson guilty of culpable negligence, but not of actively permitting child abuse, as the Oklahoma statute requires for a first-degree murder conviction. Because, even under our deferential standard of review, the evidence supported giving an instruction on second-degree manslaughter — a right protected under Beck and Spaziano — I must respectfully dissent.

A. Standard of Review

First, I must address the appropriate standard of review. We have never definitively determined whether sufficiency of the evidence to support a lesser included offense instruction is a factual or a legal question. See, e.g., Boltz v. Mullin, 415 F.3d 1215, 1233 (10th Cir.2005) (noting that the Tenth Circuit has not yet decided the appropriate standard); Turrentine v. Mullin, 390 F.3d 1181, 1197 (10th Cir.2004) (same); Hogan v. Gibson, 197 F.3d 1297, 1306 (10th Cir.1999) (same). If it is a legal question, we must ask whether it was contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1). If it is a factual determination, we must ask whether the OCCA’s conclusion was “an unreasonable determination of the facts in light of the evidence presented.” 28 U.S.C. § 2254(d)(2). Further, if factual, we must presume the state court’s determinations to be correct unless Mr. Gilson has presented clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).
The Oklahoma Court of Criminal Appeals characterizes the sufficiency of the evidence to support a lesser included offense instruction as a legal issue. See e.g., Young v. State, 12 P.3d 20, 39 (Okla.Crim.App.2000). Moreover, in direct criminal appeals, we treat denials of lesser included offense instructions as legal determinations. See, e.g., United States v. Castillo, 140 F.3d 874, 886 (10th Cir.1998).
Consistent with this approach, the sufficiency of the evidence to support a lesser included offense instruction seems to me not to be a purely factual determination. See Hogan, 197 F.3d at 1306 n. 6 (stating that although the panel cannot resolve the inconsistency itself, it unanimously agrees that we should treat the determination as a conclusion of law). While such a determination involves some application of the facts, this is not the end of the inquiry, as “[t]his appellate function does not involve fact finding in the first instance, but rather a review of the record to determine whether the factfinder had an evidentiary basis for its rulings which would satisfy the legal standard in question.” Bryson v. Ward, 187 F.3d 1193, 1211 (Briscoe, J., concurring) (emphasis added). In this case, the OCCA did not find any facts in determining that Mr. Gilson was not entitled to lesser included offense instructions. Instead, the OCCA applied the clearly established federal legal standard set forth in Beck, to the facts in the record.
“No presumption of correctness attaches to legal conclusions or determinations on mixed questions of law and fact.” Case v. Mondragon, 887 F.2d 1388, 1393 (10th Cir.1989). Therefore, we must review such legal determinations under § 2254(d)(1), reversing the OCCA only if its determination was an unreasonable application of Beck. I maintain that it was.

*1252
B. The second-degree manslaughter instruction

Under Beck, “a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt on a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict.” 447 U.S. at 627, 100 S.Ct. 2382 (internal quotation marks omitted). It is the jury’s duty to weigh the evidence — not ours, and not the OCCA’s. But in order to allow a jury to most freely perform its duties, we must be sure that state courts follow Beck’s mandate, which was designed “to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.” See Spaziano, 468 U.S. at 455, 104 S.Ct. 3154. Beck’s mandate applies even when the convicting jury retained the discretion not to sentence the defendant to death. Hooks v. Ward, 184 F.3d 1206, 1227 (10th Cir.1999). Here, the evidence supported instructions for culpable negligence second-degree manslaughter under Okla. Stat. Ann. tit. 21, § 716.
1. Second-degree manslaughter defined
“Every killing of one human being by the act, procurement, or culpable negligence of another ... is manslaughter in the second degree.” Okla. Stat. Ann. tit. 21, § 716. Oklahoma defines culpable negligence as “the omission to do something which a reasonably careful person would do, or the lack of the usual ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions.” Oklahoma Uniform Jury Instructions — Criminal 4-104 (2007). Mr. Gilson argues that he fell asleep on the couch while Shane was alone with Ms. Coffman, but did not actively permit Shane’s abuse, as the first-degree murder statute requires. “To permit” as used in Oklahoma’s child-abuse murder statute means “to authorize or allow for the care of a child by an individual when the person authorizing or allowing such care knows or reasonably should know that the child will be placed at risk of abuse.... ” Okla. Stat. Ann. tit. 10, § 7115. As the State argued in its brief before us, “[t]h[e] definition [of ‘to permit’] does not encompass a mere failure to act ... but instead anticipates one’s affirmative action .... ” Aple’s Br. at 42 (emphasis added).
“Permitting” under the first-degree child abuse murder statute requires active authorization. A “mere failure to act,” that does not involve the affirmative action necessary to support a first-degree murder child abuse conviction may constitute culpable negligence. Oklahoma courts have found a defendant guilty of such a culpably negligent failure to act, when, for instance, he failed to seek medical care for a sick child. Funkhouser v. State, 763 P.2d 695 (Okla.Crim.App.1988).[1] The “kaleidoscopic nature of the varying degrees of mental culpability,” People v. Green, 56 N.Y.2d 427, 452 N.Y.S.2d 389, 437 N.E.2d 1146, 1149 (1982), makes the line between active permission necessary for first-degree murder and a culpably negligent failure to act hard to draw. Determining a given defendant’s degree of culpability, however hard to define, is “to be inferred from the facts and circumstances proved and involve[s] *1253 fíne gradations along but a single spectrum of culpability.” Id. (internal quotation marks omitted). The question for us is whether a rational jury could have found that Mr. Gilson engaged in some failure to act that falls short of the necessary active authorization required to meet Oklahoma’s definition of “permit” but is still actionable as culpable negligence.
2. The evidence
“[I]t has long been beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.” Beck, 447 U.S. at 635, 100 S.Ct. 2382 (internal quotation marks omitted). After considering all of the State’s evidence, I believe there remains a set of facts that a rational jury could have relied on to convict Mr. Gilson of second-degree manslaughter and acquit him of first-degree murder. Although, as the majority notes, Ms. Coffman’s testimony and police interviews contained some inconsistencies as to exactly what happened that night, Ms. Coffman consistently claimed that Mr. Gilson had not abused Shane on the day of or the few days preceding Shane’s death.[2] Whatever inconsistencies plagued Ms. Coffman’s testimony as to her own actions, and whatever she stated about Mr. Gil-son’s temper in general, she was consistent as to this one, critical point.
A rational jury, believing Ms. Coffman’s testimony along with, for instance, Mr. Gilson’s claims that he was asleep on the couch during the abuse leading to Shane’s death, could have found that Mr. Gilson was culpably negligent and therefore guilty of second-degree manslaughter. The culpably negligent action in this scenario would have been falling asleep on the couch while Ms. Coffman, to his knowledge, disciplined Shane. In the closing arguments during the guilt phase of the trial, Mr. Gilson’s counsel said, “He thought that Bertha was just spanking [Shane]; that she had Shane in timeout; that he was in the bathtub; that he was not being cooperative. Nowhere in [Mr. Gilsonj’s statement is there anything about him being aware of [Ms. Coffman] beating on Shane, hitting him with a board, hitting him in the legs, hitting him in the arms, hitting him in the head, nowhere.” Trial Transcript, vol. X, at 2202-03. Mr. Gil-son’s counsel further pointed to the report of the state’s investigator, Cliff Winkler, which noted that Mr. Gilson’s testimony was consistent with Ms. Coffman’s as to the fact that he was asleep when she came in and reported that Shane was not breathing and that he then performed CPR for an hour and a half. Id. “[Mr. Gilson] said he was in shock. He said he had no conceivable idea what had happened.” Id.
A rational jury could believe this set of facts and find that Mr. Gilson did not actively permit Ms. Coffman’s abuse that killed Shane, but instead negligently failed to intervene, falling asleep while she was alone with him. A rational jury could have found that this failure to act, while tragic, did not rise to the level of affirmatively, *1254 actively, wilfully permitting Ms. Coffman to abuse Shane — that is, that along the spectrum of culpability, Mr. Gilson’s failure to act was culpably negligent.
The majority states that Ms. Coffman’s testimony’s “internal inconsistencies” and “the overwhelming weight of the State’s evidence” establish that no rational juror could convict Mr. Gilson of manslaughter while acquitting him of first-degree murder. Maj. Op. at 1237-38. The majority is certainly right that the State presented abundant evidence to support Mr. Gilson’s first-degree murder conviction — but, respectfully, this is not the question:
A Beck claim is not the functional equivalent of a challenge to the sufficiency of the evidence for conviction; rather, Beck focuses on the constitutionality of the procedures employed in the conviction of a defendant in a capital trial and is specifically concerned with the enhanced risk of an unwarranted capital conviction where the defendant’s life is at stake and a reasonable jury could have convicted on a lesser included offense.
Hogan, 197 F.3d at 1305 (emphasis added).
As the State itself noted in its closing argument during the guilt phase of the trial, Ms. Coffman has consistently claimed that she and she alone is responsible for Shane’s death. Trial Transcript, vol. X, at 2161. The State further argued that the jury should not believe Ms. Coffman’s version of events because “[tjhere is a bond between those two, Bertha Jean and Donald Lee,” id. at 2162, and that “[Ms. Coff-man] thinks she’s got the death penalty beat and she is going to try her damnedest to give him the same gift out of you.... From her jail cell Bertha Jean is still trying to run things, and she will if you let her.” Id. at 2163. While it is certainly possible Ms. Coffman may have been covering up for Mr. Gilson, the State’s mere intimations regarding Ms. Coffman’s motivation is not enough to render Ms. Coff-man’s testimony unbelievable by any rational jury.
3. Application of Beck
It is neither our job, nor the OCCA’s to weigh the evidence and decide which side’s is stronger. “Our question is not whether the evidence pointing to the lesser offense ... was weak.” United States v. Humphrey, 208 F.3d 1190, 1207 (10th Cir.2000). Instead, we must ask whether “there is any evidence fairly tending to bear upon the lesser included offense, however weak that evidence may be.” Id. A trial court may properly deny a defendant’s request for a lesser included offense instruction only when there is no evidence to reasonably support that conviction. See, e.g., Young v. Sirmons, 486 F.3d 655, 672 (10th Cir.2007) (defendant not entitled to a lesser included second-degree murder instruction when “forensic evidence revealed that there were at least three weapons used during the gunfíght, and there was no evidence of shots fired by anyone but [the defendant and two others] ”) (emphasis added), cert. denied, — U.S. -, 128 S.Ct. 1269, — L.Ed.2d -, (2008); Darks v. Mullin, 327 F.3d 1001, 1010 (10th Cir.2003) (defendant not entitled to a lesser included first-degree manslaughter instruction when “[his] attorney was forced to concede at oral argument, that no evidence supported] the adequate provocation element”) (emphasis added).
Here, the State did present ample evidence that Mr. Gilson’s treatment of the Coffman children was, at times, nothing short of atrocious. Nevertheless, in conducting our lesser included offense inquiry, we must only concern ourselves with the events that caused Shane’s death. The evidence of prior abuse on which the State relied to support the capital murder charge is not evidence that Mr. Gilson necessarily caused or wilfully permitted *1255 Shane’s death. Although the State’s case was strong, the State’s presentation of the facts was not the only reasonable interpretation of the evidence, and the jury did not have to believe it (and in fact did not believe the evidence in three of the five counts of injury to a minor). We already know that the jury was split as to whether Mr. Gilson actively permitted the abuse or committed it himself. Especially in light of Ms. Coffman’s unequivocal testimony that Mr. Gilson played no part in abusing Shane the day he died, and the testimony of both that Mr. Gilson was asleep on the couch, it is not the case that there was no evidence to support an instruction on second-degree manslaughter.
Beck and its progeny are meant to ensure that no jury in a capital case is faced with an all-or-nothing decision when the evidence supports a third option. In this case, the evidence did just that. Because “permitting” child abuse requires affirmative action, a rational juror could have found that Mr. Gilson guilty of the culpable negligence of second-degree manslaughter, without finding that his failure to act rose to the level of affirmative action required to prove first-degree murder beyond a reasonable doubt. However, the jury was still faced with an all-or-nothing decision. Because, in my view, the OCCA’s determination was an unreasonable application of Beck and Mr. Gilson was entitled to a second-degree manslaughter instruction, I must dissent.

. See, e.g., Trial Transcript, vol. VI, at 1403-04, 1375 (Ms. Coffman stating that, as she said in the February 9 interview with police, Don Gilson did not touch Shane on the day he died and that Mr. Gilson hadn't done anything else to discipline Shane that day). See also Add. Aplt's Br., at 145, 154, 180 (Oklahoma State Bureau of Investigation Interview Transcript) (stating "[I]t was about two days before [Shane died] that he had spanked Shane,” "Nobody touched that boy [Shane] but me that day. Nobody,” and, "I have gone over this, and over this, and over this and for six, for almost six months. But believe me, I lived this day every day of my life since then. And I don’t remember him ever spanking Shane that day.”).