**FILED**
**PUBLISH** **United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS** **May 12, 2010**

**TENTH CIRCUIT** **Elisabeth A. Shumaker**
**Clerk of Court**

ERNEST EUGENE PHILLIPS,

Petitioner - Appellant,

v.                                                    No. 08-7043

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

Respondent - Appellee.

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:01-CV-45-JHP-KEW)**

Gregory W. Laird, Foshee & Yaffe, Oklahoma City, Oklahoma (James L.
Hankins, Ogle Law Office, PLLC, Oklahoma City, Oklahoma with him on the
briefs), for Petitioner-Appellant.

Jennifer J. Dickson, Assistant Attorney General (W.A. Drew Edmondson,
Attorney General of Oklahoma, with her on the brief), for Respondent-Appellee.

Before **HENRY, MURPHY**, and **O'BRIEN**, Circuit Judges.

**HENRY**, Circuit Judge.

After hearing evidence regarding the tragic death of Jason McFail, a jury in

the District Court for Bryan County, Oklahoma convicted Eugene Phillips on one

count of first-degree malice aforethought murder and sentenced him to death. The trial court denied his request to instruct the jury regarding the non-capital lesser-included offense of second-degree depraved mind murder. The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Mr. Phillips's conviction and sentence and denied post-conviction relief.

In this 28 U.S.C. § 2254 proceeding, Mr. Phillips contends that under clearly established constitutional principles set forth in *Beck v. Alabama,* 447 U.S. 625 (1980), the jury should have been instructed on second-degree depraved mind murder. The district court denied that claim, and Mr. Phillips reargues it on appeal.

In analyzing Mr. Phillips's *Beck* argument, we must grapple with a rather confusing and shifting line of Oklahoma cases. At the time of Mr. Phillips's trial, second-degree depraved mind murder was a lesser-included offense of first-degree malice aforethought murder. By the time that the OCCA issued its decision in Mr. Phillips's direct appeal, that court had overturned its precedent — second-degree depraved mind murder was no longer a lesser-included offense. However, twelve days after the OCCA issued its opinion in Mr. Phillips's direct appeal – and before it denied his petition for rehearing – the court returned to its earlier view, adopting the overwhelming majority view that second-degree depraved mind murder is a lesser-included offense of first-degree malice aforethought murder.

In light of this change in the law and because we conclude that the evidence would have supported a verdict on both first-degree murder and the lesser-included non-capital offense of second-degree depraved mind murder, we hold that the OCCA's decision was contrary to *Beck* and we reverse and remand with instructions to conditionally grant Mr. Phillips's petition, subject to the State's right to retry him within a reasonable time.

## I. BACKGROUND

The facts underlying the death of Mr. McFail are difficult to comprehend. We draw largely on the OCCA's description of the factual underpinnings of the events that unfolded in late July 1996. *See Phillips v. State*, 989 P.2d 1017, 1024-25 (Okla. Crim. App. 1999).

On July 17, 1996, Brian Ezell and his parents traveled to Sherman, Texas, to pick up the seventeen-year old Mr. McFail. They returned with him to their home in Durant, Oklahoma for a several day visit. On the evening of July 19, Mr. Ezell and Mr. McFail picked up Mr. Ezell's cousin, Shannon Hearn, and went to get gas for the car. Around 11 p.m., they saw two of Mr. Ezell's friends, Davida Clark and Christina Chambers, parked outside of the Love's Country Store. Mr. Ezell drove over to the Love's parking lot where the three youths exited the car. Shortly thereafter, Mr. Phillips walked across the parking lot, and the group heard him shouting obscenities as he approached them: "you niggers need to get your

3

asses the hell out of town" and "run nigger run." 989 P.2d at 1024.

Mr. Phillips approached Mr. McFail, who backed up, asked Mr. Phillips to leave him alone, and said that he was leaving the area. Mr. Phillips then shoved Mr. McFail in the chest so that he fell onto Mr. Ezell's car. Still uttering obscenities, Mr. Phillips next approached Mr. Ezell and similarly shoved him up against Ms. Chambers's nearby car. Mr. Ezell then got up and backed away from Mr. Phillips, at which time he observed a knife in Mr. Phillips's hand. Mr. Ezell testified that Mr. Phillips smelled like beer and agreed that Mr. Phillips was "basically a man with liquor on his breath [who] came up and picked a fight . . . for no reason." State Trial Tr. vol. III, at 410.

Mr. Phillips proceeded to enter the convenience store and ask the attendant for a light for his cigarette. A few other customers in the store had already told the attendant that there was someone outside with a knife. When the attendant rejected Mr. Phillips's request for a light and told him to leave, he shouted "nigger lover" and threatened to come over the counter at the attendant. *Phillips*, 989 P.2d at 1025.

The attendant again told Mr. Phillips to leave, and Mr. Phillips "just kind of stood at the door for a little bit and stared [him] down." State Trial Tr. vol. III, at 465. Mr. Phillips then turned around and left the store. The convenience store attendant also testified that Mr. Phillips was "hyped up" and "wasn't in a normal state." *Id.* at 471.

4

Meanwhile, Mr. McFail had approached Ms. Clark and said he thought he had been stabbed. When he lifted his shirt, blood pumped from his chest each time his heart beat. He collapsed on Ms. Clark, who laid him on the ground. Mr. McFail was conscious, but unable to speak. As Mr. Phillips left the convenience store, he walked past the gravely injured Mr. McFail lying on the ground and said "that's right nigger," "how do you like that you fucking nigger" and "feels good don't it." 989 P.2d at 1025.

The first police officers on the scene found Mr. McFail conscious and attempted to question him, but he was still unable to speak. Within two minutes of the officers' arrival, while the officers continued to attempt to question him, Mr. McFail took a big breath and closed his eyes. The officers were unable to find a pulse. The ambulance arrived soon thereafter, but Mr. McFail did not respond to life- saving procedures.

Meanwhile, after leaving the convenience store parking lot, Mr. Phillips went to a nearby bar called The Watering Hole. He told the bartender that he had arrived in town three days earlier. The bartender testified that Mr. Phillips told her that he had returned from his work on an oil rig, and that his wife or girlfriend and young child were living with Mr. Phillips's father in Oklahoma. State Trial Tr. vol. III, at 475-76, 482. He told her that he had "fucked up" and had "messed up his whole life." *Id.* at 476, 482. According to the bartender, Mr. Phillips became emotional talking about his family. *Id.* at 483-84. During the hour and a

5

half he was at the bar that night, he told the bartender that he did not want to cause any problems, he had a knife, and she could take it if she wanted. The bartender did not ask to see or take the knife.

In talking with the bartender, Mr. Phillips asked her what she would do if she had done something really bad. Mr. Phillips then told her that he would turn himself in to the police the next day. He gave her the number of his brother Johnny. Mr. Phillips asked her to call his brother if the police were looking for him. He asked her to tell his brother he was sorry, that he did not mean to "do it," and that his brother should come visit him. *Id.* at 485. The bartender testified that Mr. Phillips repeatedly said that he was sorry and appeared regretful. *Id.* at 485-86.

The next day, July 20, 1996, seven or eight police officers arrested Mr. Phillips at his brother's home outside of Blue, Oklahoma on a 1995 city warrant for driving with a suspended license. All of the officers and their vehicles were visible to Mr. Phillips, and he remarked, apparently before he had been Mirandized, that "all these cops for a city warrant, you act like I killed somebody or something." *Id.* vol. IV, at 62. After he was placed under arrest, Mr. Phillips asked if he could have his wallet. The officers escorted him to the living room, where he pointed to his wallet on the coffee table. The officer who retrieved the wallet noticed a knife sitting about two inches from Mr. Phillips's wallet, and took the knife into custody.

Once in custody, Mr. Phillips told police he had been working in Louisiana and had been in Durant only three or four days. Mr. Phillips denied any involvement in the stabbing, stating he had been with friends at various bars on the evening of July 19.

On July 22, 1996, Mr. Phillips was charged by information with first-degree murder. Mr. Phillips's trial counsel sought a determination of competency, and on September 5, 1996, Mr. Phillips was committed to Eastern State Hospital for observation and a competency evaluation. At a November 6, 1996 post-examination competency hearing, the State and defense counsel stipulated that the doctor who had performed the competency evaluation at Eastern State Hospital found Mr. Phillips competent. The trial court ordered Mr. Phillips to stand trial.

On April 8, 1997, a few weeks before trial was to begin, Mr. Phillips's counsel filed a motion seeking to have his client medicated for a psychotic disorder. According to counsel, Mr. Phillips was expressing thoughts of suicide and experiencing delusions and hallucinations, increasing the possibility of a violent outburst during trial. The following day, the trial court acknowledged that Mr. Phillips had been diagnosed "as having a psychotic disorder by a licensed, board-certified psychiatrist" who ordered medication for treatment of the disorder. State Ct. Rec. vol. III, at 433. The court granted counsel's motion that Mr. Phillips be medicated at state expense.

7

On April 21, 1997, defense counsel filed a motion for a continuance and an application for a determination of competency. Defense counsel noted that Mr. Phillips had still not received the medication that the court had ordered two weeks before. Counsel submitted affidavits from the same board-certified psychiatrist and also from a licensed psychologist who determined that Mr. Phillips was not competent to stand trial because he was unable to assist his counsel.

The trial court held a hearing in which the defense put forth affidavits from the two doctors and presented testimony of two criminal defense investigators with experience in mental health issues. Mr. Phillips's counsel also testified as to his client's behavior. The State offered testimony from the unit manager where Mr. Phillips was housed. After hearing the testimony, despite the lack of the court-ordered medication, the trial court denied defense counsel's motion, noting that Mr. Phillips appeared to be "thinking pretty soundly." Tr. of April 22, 1997 Competency Hr'g, at 55. The day before trial, defense counsel again sought a continuance. He informed the court that his client still had not received the court-ordered medication. The court denied the motion, and the case proceeded to trial.

During the first stage of trial, defense counsel repeatedly attempted to present testimony regarding Mr. Phillips's state of mind. He sought to dispute the element of Mr. Phillips's alleged intent to kill.

In particular, defense counsel argued that evidence of Mr. Phillips's emotional state and his history of being abused by his father were relevant to his

8

state of mind on the day of the homicide. Defense counsel also asserted that Mr. Phillips had come to Durant to confront his father about this history of abuse and to check on Mr. Phillip's child. Defense counsel contended that as a result, Mr. Phillips had been intoxicated during his two or three days in Durant and had threatened suicide. Defense counsel also submitted a proposed instruction on the lesser-included offense of second-degree depraved mind murder.

The State, in response, argued that this mitigation evidence might be admissible only during the sentencing phase of the trial, should there be one. The trial judge agreed with the State's argument and refused to give the lesser-included offense instruction. Because Mr. Phillips could not present this evidence, his counsel called no witnesses to testify during the guilt phase. The defense did make an offer of proof concerning Mr. Phillips's emotional state and his relationship with his father. *See* 989 P.2d at 1029-30.

Also at trial, the State medical examiner, Dr. Fred Jordan, determined that Mr. McFail died from a single stab wound from a pocketknife or a similar implement. The wound was about two to three inches deep and "caused a 1.2 centimeter cut on the anterior surface of [Mr. McFail's] heart." State Trial Tr. vol. IV, at 110. Dr. Jordan testified that blood loss caused Mr. McFail's death. "This is not a wound that is going to kill you instantly, you can live for several minutes perhaps half an hour or so. . . . It's a survivable wound if you can get to a chest surgeon quickly enough." *Id.* at 126-27.

9

Dr. Jordan also testified that "most people [who] just get a single stab wound to the chest probably survive" because the more typical injury from such a stab wound is to a lung. *Id.* at 127. "And if it goes into the lung and they receive medical attention probably most people survive." *Id.* Additionally, Dr. Jordan stated that "[i]t's unusual to see a stab wound through the ribs." *Id.* at 128. In the conclusion to the cross examination, Dr. Jordan stated that "[p]eople with knife wounds of the lung and heart survive. Some people die. A lot of it depends on the individual and depends on how rapidly they get medical care and depends on what medical care is available." *Id.* at 133. He explained that "[w]hen you have a stab wound to the chest, you are in grave danger. You may live or you may die." *Id.* at 134. He added that "[n]o stab wound to the chest is sure to kill someone." *Id.*

The jury convicted Mr. Phillips of first-degree malice aforethought murder. OKLA. STAT. tit. 21, § 701.7(A). During the sentencing stage, the jury found two aggravating circumstances: first, that the killing was heinous, atrocious, and cruel; and second, that Mr. Phillips posed a continuing threat to society. Accordingly, it imposed the death penalty. The OCCA affirmed Mr. Phillips's conviction and sentence on direct appeal, *see* 989 P.2d 1017, and denied his petition for rehearing. The Supreme Court denied certiorari, and the OCCA then denied post-conviction relief.

Mr. Phillips filed a habeas petition under 28 U.S.C. § 2254 in federal

10

district court, where he raised seventeen issues. The district court denied relief on each claim. However, as to two issues, the district court determined that Mr. Phillips had demonstrated a "substantial showing of the denial of a constitutional right," which means that reasonable jurists could resolve those issues differently. 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) It therefore granted a certificate of appealability on two issues: (1) the sufficiency of evidence to support each of the aggravating circumstances; and (2) Mr. Phillips's competency to stand trial. Subsequently, this court issued a case management order granting a certificate of appealability on three additional issues: (3) whether the trial court violated Mr. Phillips's right to due process when it failed to grant an instruction on a lesser-included offense; (4) whether Mr. Phillips was denied due process at the penalty stage of the state trial because the court permitted improper victim impact testimony; and (5) whether Mr. Phillips received ineffective assistance of counsel during the sentencing stage of the trial because his counsel failed to present testimony that Mr. Phillips lacked a history of racial animus. *See* Case Management Order, filed July 17, 2008.

## II. DISCUSSION

Mr. Phillips raised five contentions in his briefs before us. Upon thorough review of the record and the applicable law, we are persuaded by his first argument. We hold that the OCCA's conclusion that Mr. Phillips was not entitled

11

to an instruction on second-degree depraved mind murder is contrary to the principles set forth in *Beck v. Alabama*, 447 U.S. 625 (1980)*,* and that the Due Process Clause of the Fourteenth Amendment entitles him to a new trial. We therefore reverse and remand, so that the district court may grant the petition for habeas corpus, and allow the state to retry him. As a result, we do not address Mr. Phillips's remaining four claims.

**A.     Second-degree murder was a lesser-included offense at the time of Mr. Phillips trial and at the time the OCCA denied Mr. Phillips's petition for rehearing.**

Before we turn to Mr. Phillips's contention that the Due Process Clause entitled him to an instruction on the lesser-included offense of second-degree depraved mind murder, we must consider Oklahoma's shifting precedents and statutes. In May 1997, at the time of Mr. Phillips's trial, the OCCA considered second-degree depraved mind murder to be a lesser-included offense of first-degree murder. *See Willingham v. Mullin,* 296 F.3d 917, 922-26 (10th Cir. 2002).

In October 1997, while Mr. Phillips's direct appeal was pending, the OCCA issued *Willingham v. State*, 947 P.2d 1074, 1080-81 (Okla. Crim. App. 1997), which "revisit[ed] the elements of second degree depraved mind murder" and recognized that the OCCA's "case law failed to recognize [a 1976 amendment to the state's murder scheme] in the statutes." *Id.* at 1081. Because of that amended statute, the OCCA decided Mr. Phillips's direct appeal (Oct. 15, 1999) by applying *Willingham v. State*'s holding that second-degree depraved mind murder

12

was *not* a lesser-included offense of first-degree murder.  *Phillips*, 989 P.2d 1034.

However, on October 27, 1999, just twelve days after the OCCA decided Mr. Phillips's direct appeal, the OCCA candidly recognized its "continue[d] . . . inconsisten[cy] in its approach to lesser included offenses."  *Shrum v. State*, 991 P.2d 1032, 1036 (Okla. Crim. App. 1999).  The court adopted the common law and majority view that "all lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be administered if they are supported by the evidence."  *Id.*  The OCCA's decision was "prospective only" and would apply "only to those cases now pending on appeal and in all future cases." *Id.*

While his case was still on direct appeal, on November 4, 1999, Mr. Phillips filed a petition for rehearing, and again raised the lesser-included offense/*Beck* argument, citing *Shrum*.[1]  The OCCA denied Mr. Phillips's petition on December 14, 1999.  The OCCA determined "that while *Shrum* was not cited in the [OCCA opinion],[2] the same analysis used in the *Shrum* case was utilized in

---

[1]  Mr. Phillips's filing of the petition for rehearing is especially important, because had the OCCA denied Mr. Phillips's *Beck* claim during the period of time when Oklahoma did not recognize second-degree depraved mind murder to be a lesser-included offense of first degree murder, and relied "on the ground that second degree murder was not a lesser-included offense of first degree murder, his petition for relief would fail even though second degree murder was a lesser included offense at the time of his trial."  *Taylor v. Workman*, 554 F.3d 879, 888 (10th Cir. 2009) (citation omitted).

[2]  *Shrum* was probably not cited initially by the OCCA because it had not
(continued...)

13

[Mr. Phillips's] case." Order Denying Rehearing at 4.

We now turn to the substance of Mr. Phillips's argument that he was entitled to a second-degree depraved mind murder instruction under *Beck v. Alabama*. As we explain below, to the extent the OCCA applied *Shrum*, its application was contrary to the clearly established Supreme Court law of *Beck*.

**B.     AEDPA governs our review of Mr. Phillips's § 2254 petition.**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we cannot grant an application for a writ of habeas corpus on behalf of a person in state custody pursuant to the judgment of a state court with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(1), (2).

A state court decision is "contrary" to clearly established law "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts."  *Bell v. Cone*, 535 U.S. 685, 694 (2002).

_____

[2](...continued)
yet been decided.

14

A state court decision is an "unreasonable application" of clearly established law when the state court "'identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)).

## C.      The OCCA's decision is contrary to *Beck*.

The Supreme Court's decision in *Beck* provides the basis for Mr. Phillips's contention that the OCCA's decision concluding that Mr. Phillips was not entitled to an instruction on second-degree depraved mind murder violated clearly established federal law.  In *Beck*, the Court held that "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Id.* at 627.  As a result, "state rules barring properly supported lesser-included offense instructions in a capital case are constitutionally impermissible because such rules 'diminish the reliability of the guilt determination' and 'enhance the risk of an unwarranted conviction.'" *Mitchell v. Gibson*, 262 F.3d 1036, 1050 (10th Cir. 2001) (quoting *Beck*, 447 U.S. at 638).  The Supreme Court has reiterated that the goal in *Beck* was to "eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." *Schad v. Arizona*, 501 U.S. 624, 646-47

15

(1991) (quoting *Spaziano v. Florida*, 468 U.S. 447, 455 (1984)).

*Beck* emphasized that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." 447 U.S. at 637. The Court concluded that "[s]uch a risk cannot be tolerated in a case in which the defendant's life is at stake" and that "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [a state] is constitutionally prohibited from withdrawing that option from the jury in a capital case." *Id*. at 637-638. The Court has since "reaffirm[ed] its] commitment to the demands of reliability in decisions involving death and to the defendant's right to the benefit of a lesser included offense instruction that may reduce the risk of unwarranted capital convictions." *Spaziano*, 468 U.S. at 456.

Mr. Phillips's *Beck* claim has two components. First, he must establish that the crime on which the trial court refused to instruct was actually a lesser-included offense of the capital crime of which he was convicted. *Hogan v. Gibson*, 197 F.3d 1297, 1306 (10th Cir. 1999). Second, he "must show that the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first degree murder." *Young v. Sirmons*,

16

486 F.3d 655, 670 (10th Cir. 2007); *see Taylor*, 554 F.3d 879, 888 (10th Cir. 2009) (noting that "[t]he proper inquiry is whether the defendant presented sufficient evidence to 'allow a jury to rationally conclude' that the defendant was guilty of the lesser-included offense" (citing *Hogan*, 197 F.3d at 1308)); *Hooks v. Ward*, 184 F.3d 1206, 1223-29 (10th Cir. 1999) (discussing *Beck*). We consider the OCCA's analysis of each component in turn.

1. *The trial court refused to instruct on a requested lesser-included offense.*

We have already noted that second-degree depraved mind murder was a lesser-included offense of first-degree murder at the time of trial and while Mr. Phillips's conviction was on direct appeal. There is no dispute that Mr. Phillips sought and was denied his proffered instruction. *See* State. Ct. Rec. vol. III, at 516 - 518, 524. Thus, Mr. Phillips has established the first component of a *Beck* claim.

2. *The OCCA considered the evidence presented at trial and concluded that a rational jury could not acquit Mr. Phillips of first-degree murder and convict him of second-degree depraved mind murder, but its analysis was contrary to* Beck.

The jury convicted Mr. Phillips of first-degree malice aforethought murder. 21 Okla. Stat tit. 21, § 701.7(A) (1991). In analyzing his *Beck* claim, we must consider the elements of both first-degree malice aforethought murder and second-degree depraved mind murder in light of the evidence presented at Mr. Phillips's trial. *See Malicoat v. Mullin*, 426 F.3d 1241, 1253 (10th Cir. 2005).

17

As the trial court instructed the jury, the elements of first-degree malice aforethought murder are:

"First, the death of a human; Second, the death was unlawful; Third, the death was caused by the Defendant; [and] Fourth, the death was caused with malice aforethought." State Ct. Rec. vol. IV, at 598; *see* Okla. Stat. tit. 21, § 701.7(A). "Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof." *See* Okla. Stat. tit. 21, § 701.7(A)

The elements of second-degree depraved mind murder are: (1) the death of a human; (2) caused by conduct which was imminently dangerous to another person; (3) the conduct was that of the defendant; (4) the conduct evinced a depraved mind in extreme disregard of human life; and (5) the conduct was not done with the intention of taking the life of any particular individual. *Taylor v. State*, 998 P.2d 1225, 1231 (Okla. Crim. App. 2000), *abrogated on other grounds by Malone v. State*, 168 P.3d 185 (Okla. Crim. App. 2007); Okla. Stat. tit. 21, § 701.8.

In rejecting Mr. Phillips's argument that the jury should have been instructed on second-degree depraved mind murder, the OCCA divided its analysis into two parts.

First, after recognizing that under Oklahoma law "[a] defendant is entitled to an instruction on every degree of homicide which is a lesser included offense

18

of the primary charge and which is supported by the evidence," 989 P.2d at 1034,

the court reiterated that "second degree depraved mind murder was not a lesser-

included offense [of first-degree malice murder]. *Id.* As we have noted, twelve

days after the initial opinion in Mr. Phillips's direct appeal, the OCCA overturned

its precedent and held that second-degree depraved mind murder was a lesser-

included offense of first-degree malice aforethought murder. *See Shrum*, 991

P.2d at 1036. Nevertheless, in its order denying Mr. Phillips's petition for

rehearing, the OCCA stated that it had "applied the same analysis used in the

*Shrum* case." Order Denying Rehearing, at 4.

Second, the OCCA considered whether Mr. Phillips was entitled to an

instruction on second-degree depraved mind murder under *Beck*. In its view, "the

evidence in the present case did not support a second degree murder instruction"

and 'the jury was thus properly precluded from considering that particular non-

capital option.'" 989 P.2d at 1035 (quoting *Valdez v. State*, 900 P.2d 363, 378-79

(Okla. Crim App. 1995)).

The OCCA's assessment of the lack of evidence supporting a second-

degree murder instruction appears to be based largely on its view that the

evidence *did* support Mr. Phillips's conviction for first-degree malice

aforethought murder. It reasoned that:

> [Mr. Phillips] argues that given the fact he stabbed the victim, only
> once, with a small pocket knife, and that he did so while he was angry
> with his father, a reasonable juror could have found that his acts were

19

imminently dangerous and evinced a depraved mind but were committed without the design to effect death. [He] specifically relies on testimony by the medical examiner that the type of wound suffered by the victim was "survivable."

[Mr. Phillips] fails to note that the medical examiner testified that such a wound was survivable only if the victim got to a "chest surgeon quickly enough." . . . *We find the evidence showed* [Mr. Phillips] *acted with the specific intent to effect the death of the victim.*

*Id.* at 1034-35 (emphasis supplied).

The OCCA arrived at the

*unmistakable conclusion that* [Mr. Phillips] *fully intended the consequences of his acts.* An obviously agitated [Mr. Phillips] approached the unarmed victim shouting obscenities and ignoring the victim's pleas to be left alone. [He] stabbed the victim on the left side of his chest. [Mr. Phillips] walked over the fallen victim as he both entered and exited the convenience store. As he exited, [Mr. Phillips] was heard to say "that's right nigger," "how do you like that you fucking nigger" and "feels good don't it." If [Mr. Phillips]'s words were more akin to "fighting words" as he argues, and he did not intend for anyone to die, then he could have stabbed the victim somewhere other than the heart. However, the uncontradicted evidence concerning the location of the victim's wound and [Mr. Phillips]'s conduct toward the victim, both before and after the stabbing, *clearly show he intended to kill the victim.* Accordingly, we find the evidence sufficient to support the conviction for first degree malice aforethought murder.

989 P.2d at 1029 (emphasis supplied).

In our view, by limiting its analysis of Mr. Phillips's *Beck* claim to the sufficiency of the evidence supporting the first-degree murder conviction, the OCCA's reasoning turns *Beck* on its head, and "is in gross deviation from, and disregard for, the Court's rule in *Beck.*" *Hogan,* 197 F.3d at 1305. As Judge Lucero explained for our court in *Hogan*,

20

[a] *Beck* claim is not the functional equivalent of a challenge to the sufficiency of the evidence for conviction; rather, *Beck* focuses on the constitutionality of the procedures employed in the conviction of a defendant in a capital trial and is specifically concerned with the enhanced risk of an unwarranted capital conviction where the defendant's life is at stake and a reasonable jury could have convicted on a lesser included offense.

*Id.* "Under *Beck*, courts *are not directed* to evaluate the evidence to determine whether it would support a first degree murder conviction, or even whether a conviction for first degree murder or a lesser-included offense is better supported." *Taylor*, 554 F.3d at 887 (emphasis supplied).

And, as Judge McConnell explained recently in *Taylor*,

If the evidence would support a verdict of either first degree murder or second degree murder, the jury must be allowed to make the choice. The effect of the OCCA's contrary approach is to deny the defendant the benefit of the second-degree murder instruction in precisely the circumstance *where it is most important: where the evidence would support conviction for first degree murder but would also support conviction on the lesser-included offense*.

*Id.* (emphasis supplied).

By relying upon the evidence that supported the conviction for first-degree murder, the OCCA committed the same error we identified in *Hogan* and *Taylor*. *See Hogan v. State*, 877 P.2d 1157, 1160 (Okla. Crim. App. 1994) (concluding that a lesser-included instruction was unwarranted because the facts "show a clear design to effect the victim's death in a cold and calculated manner"); *rev'd by Hogan*, 197 F.3d at 1305-11; *Taylor*, 998 P.2d at 1231 (reaching the same conclusion because "the [] facts suggest a design to effect the death of [the

21

victim]"), *rev'd by Taylor*, 554 F.3d at 887. And, as in *Hogan* and *Taylor*, "the OCCA's analysis here . . . was "contrary to clearly established federal law, as set forth by the Supreme Court." *Taylor*, 554 F.3d at 888 (internal quotation marks omitted).

**D.    Mr. Phillips was entitled to an instruction on second-degree depraved mind murder.**

Having determined that the OCCA's decision was contrary to *Beck*, we must now consider whether, under the proper *Beck* standard, the evidence was sufficient to warrant a jury instruction on the lesser-included offense of second-degree depraved mind murder. As we explained in *Gilson v. Sirmons*, 520 F.3d 1196 (10th Cir. 2008), "a state court's determination of whether the evidence presented at trial was sufficient under the *Beck* standard to justify a lesser-included instruction is not a finding of historical fact, but rather a legal determination reached after assessing a body of evidence in light of the elements of the alleged lesser-included offense." *Id.* at 1234. Because the OCCA did not apply the correct legal standard in assessing the evidence in Mr. Phillips's trial, we engage in de novo review. *See Bell*, 535 U.S. at 694*; Taylor*, 554 F.3d at 887 (10th Cir. 2009) (analyzing the evidence de novo in determining whether the facts warranted a proper second-degree murder instruction because the OCCA's analysis was "contrary to clearly established federal law, as set forth by the Supreme Court in *Beck*").

22

As we have noted, "[t]o succeed in his claim that the trial court's failure to instruct the jury on [second-degree depraved mind murder] violated *Beck*, "[Mr. Phillips] must demonstrate that the evidence presented at trial would permit a rational jury to find him guilty of [second-degree depraved mind murder] and acquit him of first-degree murder." *Id.* "Our question is not whether the evidence pointing to the lesser offense . . . was weak," or whether he was likely to prevail. *United States v. Humphrey*, 208 F.3d 1190, 1207 (10th Cir. 2000).

As ably outlined by the OCCA, and reiterated by the district court, the State presented ample evidence that Mr. Phillips's behavior was unlawful, inexplicable, callous, and hateful. Nevertheless "[w]hether a jury was more likely to convict on first or second degree grounds is not the question. Due process demands that a jury be permitted to consider a lesser-included offense of first-degree murder before imposing death so long as 'the evidence would have supported such a verdict.'" *Taylor*, 554 F.3d at 892-93 (quoting *Beck*, 447 U.S. at 627). Because the facts here show that Mr. Phillips may have been severely emotionally disturbed and raise doubts whether he had the requisite mental state for first-degree murder, we conclude that a jury could rationally find Mr. Phillips "guilty of the lesser offense and acquit him of the greater." *Beck*, 447 U.S. at 635. *See Taylor*, 554 F.3d at 892 (concluding "the evidence would have "allowed a jury to rationally conclude that the defendant did not intend to kill [the victim]") (internal quotation marks omitted); *see Richie v. Workman*, __ F.3d __, 2010 WL

23

1115850, at *9 (10th Cir. Mar. 25, 2010) (affirming grant of application for a writ of habeas corpus and noting that "[a]lthough the state's alternative theory of first-degree murder is a plausible one, the state must show more than plausibility to prevail on the lesser-included-offense issue").

Mr. Phillips had days earlier returned to Oklahoma apparently concerned about his father, with whom he had a very troubled and violent relationship, who had moved in with his former girlfriend and his young daughter.[3] Apparently en route to get a light at the Love's Store, he walked across the parking lot with his pocket knife exposed, according to some witnesses. He inexplicably starting shouting at Mr. McFail and his friends, and shoved Mr. McFail first, then Mr. Ezell. He did not injure Mr. Ezell beyond the shove.

As to the injury he inflicted on Mr. McFail, Dr. Jordan testified that the

---

[3] We note that the *Beck* violation here is further complicated by the apparent shortcomings in the record regarding Mr. Phillips's state of mind. As noted above, in Section I, when Mr. Phillips attempted to present evidence of his mental state in an effort to contest the intent element of the malice aforethought murder charges, the prosecution objected on the grounds the evidence was only relevant to the second-stage issue of mitigation. The trial court sustained the objection and also refused to instruct the jury on the lesser included offense of depraved mind murder. In light of this ruling, Mr. Phillips did not present any witnesses of his own during the guilt phase of the trial. Even though we address Mr. Phillips's *Beck* claim on the basis of a seriously stunted record, we remain convinced that a *Beck* violation occurred. However, we note that any shortcomings in the record are attributable exclusively to the trial court's highly questionable ruling that evidence of Mr. Phillips's state of mind at the time of the murder was irrelevant, which seems to impinge upon Mr. Phillips's Fifth, Sixth, and Fourteenth Amendment right to present an adequate defense to the first degree murder charges.

24

more typical wound resulting from a single stab to the chest with a pocketknife would be to a lung, which is more easily treated. The wound was a "1.2 centimeter cut," that, although grave, was potentially survivable if treatment was given quickly. State Trial Tr. vol. IV, at 110.

The convenience store clerk indicated that he "got real emotional." *Id.* vol. III, at 483. After retreating to the bar down the street, he told the bartender he was "a fuck up and he had been that way his whole life," and "[h]e just kept saying I'm sorry." *Id.* at 483, 486. Based on this version of events, a jury could rationally conclude that Mr. McFail's death was perpetrated by an act imminently dangerous to the victim and evincing a depraved mind, but without a premeditated design to effect death. In sum, Mr. Phillips presented an alternative version of events to the jury which could negate the intent element of first-degree murder.

Numerous precedents have addressed the reality that depraved mental states can occur and that such mental conditions may not involve the premeditated intent required for first-degree murder. For example, in *Hogan*, we concluded, under similarly atrocious facts, that Mr. Hogan was entitled to a lesser-included offense instruction on first-degree manslaughter. Mr. Hogan grabbed a knife from a long-time friend, who, after a dispute, had threatened to harm Mr. Hogan with it. Fearing that the friend was retreating to obtain another weapon, Mr. Hogan stabbed the victim approximately twenty-five times, "creating three wounds that would have been independently fatal." 197 F.3d at 1310. We concluded, despite

25

the horrific nature of the crime, and the repeated stabbings, that a reasonable jury might find adequate provocation, heat of passion resulting from fear and terror, causation and immediacy, so as to warrant a first-degree manslaughter instruction. *Id.* at 1309. To correct the error of the denial of the requested lesser-included offense instruction, we reversed and ordered a new trial. *Id.* (citing *Williams v. State*, 513 P.2d 335, 337, 338-39 (Okla. Crim. App. 1973) (when defendant shot his wife eight times at close range, and when defendant testified that "I just went blank and just stood there just pumping that gun," the OCCA ordered a new trial, holding that "[t]he lack of a premeditated design to effect death should have been submitted to the jury by a proper manslaughter in the first degree instruction")).

More recently, in *Taylor*, a jury convicted the defendant of one count of first-degree murder and three counts of shooting with intent to kill, and sentenced him to death. During a visit with a business contact who owed him $800, Mr. Taylor became startled and shot two people in the head, shot a third person twice, and killed a fourth person, by shooting him twice in the back.

The trial court gave a depraved mind lesser-included offense instruction, but the instruction was incorrect. After Mr. Taylor was convicted of first-degree murder, the OCCA found any error in the instruction harmless, because "[Mr. Taylor] testified that as he ran through the living room, he saw movement out of the corner of his eyes and fired in that direction twice, killing [the victim]. These facts suggest a design to effect the death of [the victim] and therefore do not

26

support a second degree murder instruction."  *Taylor v. State*, 998 P.2d at 1231.

Reviewing the OCCA's legal conclusions de novo, we concluded that if Mr. Taylor did not aim, but rather the gun was simply flailing around as he testified, such behavior would be imminently dangerous to another person, and it would evince a depraved mind with a disregard of human life, but it would not indicate any premeditated design to kill the victim.  *Taylor*, 554 F.3d at 891.  We noted that there was no direct evidence regarding Mr. Taylor's state of mind towards the victim, and that even if Mr. Taylor was intentionally seeking to harm the victim, a jury could have believed that Mr. Taylor had not intended to kill him.  *Id.*  We concluded:

> *Whether a jury was more likely to convict on first or second degree grounds is not the question.* Due process demands that a jury be permitted to consider a lesser-included offense of first degree murder before imposing death so long as "the evidence would have supported such a verdict."

*Id.* at 892-93 (quoting *Beck*, 447 U.S. at 427) (emphasis supplied).  *See also Turrentine v. Mullin*, 390 F.3d 1181, 1193-94 (10th Cir. 2004) (holding that when the defendant believed his sister and girlfriend were cheating him out of money, shot his sister in the head, and then drove to his girlfriend's house, shot her in the head, and proceeded to shoot her two children (aged 13 and 22) in the head, erroneous second-degree depraved mind murder instructions given on the shooting of the two children required reversal because the defendant had presented substantial evidence of his own diminished capacity at the time of the

27

murders).

This case, like *Hogan*, *Taylor*, and *Turrentine*, stands in stark contrast to others in which this court and the OCCA concluded that a lesser-offense instruction was not needed, because in those cases, the evidence did not support the lesser-included offense. *See Darks v. Mullin*, 327 F.3d 1001, 1010 (10th Cir. 2003) (holding that the defendant was not entitled to a lesser-included first-degree manslaughter instruction when "[his] attorney was forced to concede at oral argument, that no evidence support[ed] the adequate provocation element"); *Harris v. State*, 84 P.3d 731, 750 (Okla. Crim. App. 2004) (holding that when defendant drove to a transmission shop where the victim worked, pushed the victim to the ground and shot him twice at close range, the evidence did not support a lesser-included offense instruction on second-degree depraved mind murder); *Young v. State*, 12 P.3d 20, 38-40 (Okla. Crim. App. 2000) (holding that instructions on depraved mind murder were correctly refused when the defendant entered a restaurant with intent to rob its occupants with a firearm, stood directly in front of the victim, raised the firearm, demanded money, and fatally shot the victim in the back of the chest when the victim tried to defend himself); *Boyd v. State*, 839 P.2d 1363, 1367-68 (Okla. Crim. App. 1992) (holding that instructions on depraved mind murder were correctly refused when the defendant shot the victim a second time in the chest at close range); *see also Taylor*, 554 F.3d at 891-892 (collecting OCCA cases where "[t]he OCCA has upheld second degree

28

depraved mind murder convictions in a variety of cases in which the facts were similar to these, or arguably even more suggestive of an intent to kill" (citing *Dorsey v. State*, 739 P.2d 528, 529 (Okla. Crim. App. 1987); *Quilliams v. State*, 779 P.2d 990, 991 (Okla. Crim. App. 1989); *Hall v. State*, 698 P.2d 33 (Okla. Crim. App. 1985); *Tucker v. State*, 675 P.2d 459 (Okla. Crim. App. 1984)).

Here, the evidence unquestionably establishes that Mr. Phillips was guilty of a serious and violent offense, but there is "some doubt with respect to an element that would justify conviction of a capital offense." *Beck,* 447 U.S. at 637. Under *Beck,* "the failure to give the jury the "third option" of convicting on a lesser-included offense would seem inevitably to enhance the risk of an unwarranted conviction." *Id*. Because "[s]uch a risk cannot be tolerated in a case in which the defendant's life is at stake," we must reverse and remand so that Mr. Phillips may be retried.

### III. CONCLUSION

We conclude that because "the evidence would support a verdict of either first degree murder or second degree murder, the jury must be allowed to make the choice." *Taylor*, 554 F.3d at 887. Even if a jury believed that Mr. Phillips intended to harm Mr. McFail, it might have also believed that Mr. Phillips did *not* intend to kill him. *Id.* at 891. A jury might believe that Mr. Phillips was out of his mind, emotionally distraught about returning to Oklahoma, and that he meant

29

to merely harm Mr. McFail and to scare the young people in front of the convenience store. "The effect of the OCCA's contrary approach is to deny the defendant the benefit of the second-degree murder instruction in precisely the circumstance where it is *most* important: where the evidence would support conviction for first degree murder but would also support conviction on the lesser-included offense." *Id.* at 887 (emphasis supplied). And, although the State's case for first-degree murder was plausible, the jury did not have to believe it. The OCCA's failure to give the jury the third option of convicting on the lesser-included offense of second-degree depraved mind murder "inevitab[ly] . . . enhance[d] the risk of an unwarranted conviction." *Beck*, 447 U.S. at 637. As the Supreme Court has instructed, we cannot tolerate such a risk where "the defendant's life is at stake." *Id.*

For the reasons set forth above, we REVERSE the district court's decision denying Mr. Phillips's petition for a writ of habeas corpus. We REMAND the case to the district court with instructions to conditionally grant the writ as to Mr. Phillips's conviction and sentence for first-degree murder, subject to the State's right to retry him within a reasonable time. *See Fisher v. Gibson*, 282 F.3d 1283, 1311 (10th Cir. 2002).